## UNITED STATES v. KANE.

### No. 13776.

United States Court of Appeals
Eighth Circuit.

Dec. 10, 1948.

Harry Marselli, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., George A. Stinson, Ellis N. Slack and Lyle M. Turner, Sp. Assts. to the Atty. Gen., and Drake Watson, U. S. Atty., and William V. O'Donnell, Asst. U. S. Atty., both of St. Louis, Mo., on the brief), for appellant.

Herman M. Katcher, of St. Louis, Mo., for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

#### Statement.

This is an appeal from that part of a judgment of the District Court in favor of the appellee (hereinafter referred to as "debtor") in bankrupcty proceedings wherein the court, upon motion of the debtor disallowed the larger portion of the claim of the United States filed in the proceedings.

The claim in question was filed July 29, 1946, and asserted that there was due the United States the gross amount of $6,-018.78. It set forth taxes arising under the Federal Insurance Contributions Act, 26 U.S.C.A. §§ 1400, 1401, 1403, 1410, 1411, 1426, 1432 (hereafter referred to as F.I.C.A. taxes) by quarters for the period commencing October 1, 1942, and ending June 20, 1946, and taxes under the Federal Unemployment Tax Act, 26 U.S.C.A. § 1600 et seq. (hereafter referred to as F.U.T.A. taxes) by calendar years for the period from 1939 to 1945, inclusive. The taxes involved in the claim were not further segregated or identified.

On August 15, 1946, the debtor, by its attorney, filed a motion to expunge the claim and alleged, in substance, that the taxes involved were invalid for the reason that the persons whose wages formed the

basis for the taxes were not its employees. In due course the motion came on for hearing and it was there agreed that the taxes related to two groups of workers, the first of which were commonly known as "coal jobbers" and the second as "car unloaders", sometimes called "yardmen." No evidence, however, was introduced at the hearing allocating the taxes between the two groups.

On June 30, 1947, the trial court stated by letter to debtor's counsel that it intended to hold the "car unloaders" were employees but that the "coal jobbers" were not. In an order dated November 25, 1947, and filed November 28, 1947, the court directed that the claim of the United States be disallowed in its entirety. This disallowance of the claim in its entirety—even though the court held the "car unloaders" were the debtor's employees—was based upon the belief that unless the debtor had eight or more employees no taxes were due. When it was brought to the court's attention that F.I.C.A. taxes were not dependent upon the number of employees, the order was set aside. Steps were then taken to determine the amount of taxes which were due with respect to the individuals whom the court held to be employees. The amount of the wages paid to these employees and the taxes which were due thereon were agreed upon between a deputy collector and the president of the debtor, with a schedule of such wages and taxes furnished on January 13, 1948, by mail to counsel for the respective parties. Also on the same date the schedule which contained interest computations bringing the taxes referred to in it to the total amount of $268.27 was set forth upon an ordinary bankruptcy claim form signed by the Internal Revenue Collector and filed in the case, entitled "Amended Claim of the United States."

On February 12, 1948, counsel for the debtor transmitted to the court new proposed findings of fact and conclusions of law and order to replace those which had been set aside.

On February 16, 1948, the court entered the findings of fact submitted by the debtor. They reflect the extended evidence taken upon the issues which had been presented and submitted to the court for adjudication by the claim of the United States for all the F.I.C.A. and the F.U.T.A. taxes and the debtor's denial of liability therefor and the court's conclusions of law. The court adopted the figures as the amounts shown in the schedule agreed upon establishing the amount of wages paid to the employees whom the court held to be employees, namely, the "car unloaders" or "yardm 1", and allowed the claim for F.I.C.A. taxes with interest in respect to them in the sum of $292.81, and it denied the claim for F.U.T.A. taxes entirely. Its conclusions of law were further to the effect that the "coal jobbers" were not employees and the claim for taxes as it related to them was denied and that the balance of the claim involving F.U.T.A. taxes respecting "car unloaders" or "yardmen" should be denied for the reason that an insufficient number of those men worked for debtor to bring the debtor within the Act in respect to them.

Upon the main issue in the case, which concerned the nature of the relationship between the debtor and the individuals in question, the court, in substance, made the following findings of fact:

The Triangle Fuel Company, a corporation, debtor, is now and has been for several years engaged in the business of selling coal at retail.

Among the various persons who performed services in connection with this business were a group of workers commonly known as "jobbers." These jobbers were itinerant laborers, frequently colored, who stored the coal sold by debtor and delivered to the homes or places of business of the debtor's customers. They were an itinerant group and as individuals worked intermittently. Some few worked storing coal sold by the debtor intermittently over a period of years and a number intermittently over a period of months, but the bulk of them worked only short periods and would then go into other work or drift elsewhere. Some worked only a few days between other jobs. None of these workers had regular hours to work storing the coal sold by the debtor, or were required to report to the debtor, but came and went as they pleased. They also did jobs of

storing coal for other dealers in the city. Sometimes they would work in pairs.

Some of the men secured the work of storing coal from the debtor by coming to the coal yard in the morning to see if there was work to be done or by calling in to the yard. Others came to the yard in answer to the debtor's newspaper advertisements seeking men to store its coal. And in other cases they came in response to a telephone call by the debtor. The debtor maintained a large file of names of men who would do such work which it could use in securing the help when it desired. In cold weather these men were permitted to wait in the office by the scale where it was fairly warm until there was coal to be stored.

When the debtor received an order for coal and the services of a man were needed to store the coal, the office man gave the address of the customer on a "charge slip." The debtor placed the name of the jobber to whom the work was given on the work sheet showing that he had been sent to that job. The jobber then proceeded to the customer's home or place of business by riding on the coal truck delivering the coal, by driving his own automobile or by some other means. The debtor did not arrange for his transportation to the place where the work was to be done. The jobber then stored the coal in the customer's bin and, if the customer was at home, had the charge slip signed by the customer. When the jobber returned to the yard he was paid by the office for the number of tons stored. Cash customers of the debtor paid the jobbers direct, and these cash customers comprised the greatest part of debtor's business wherein the services of coal jobbers were required. Payment was made at the rate of seventy five cents (75¢) for coal and one dollar ($1) for coke. In some cases, after accepting the work the jobber refused to perform it after seeing the nature of the task involved.

While the work of storing the coal was being done the debtor maintained no supervision over the jobber. But sometimes a customer would make a complaint to the debtor about the work. These complaints the debtor took up with the man who did the work and instructed him not to repeat the offense. In other cases the debtor sent the man back to straighten the matter out with the customer.

Wheelbarrows to be used by jobbers in storing the coal were sometimes furnished by the debtor, together with a shovel. In such cases, when the work was completed, if the jobber had no way of transporting it back to the yard the wheelbarrow was left with the customer. The wheelbarrow was then brought to the yard by a coal delivery truck. Some coal jobbers owned and cared for their own wheelbarrows, shovels and other equipment used in the storing of coal.

Besides the "jobbers", the debtor from time to time had other laborers performing services in connection with its business. Among these services were such as unloading coal cars and yard work. The coal unloading was paid for by the debtor at an hourly rate. The men who would do this work would wait around the yard or come in answer to a postal card and the man in the office would tell them which car to unload. Their duties in connection with this work were to get into the coal car and shovel the coal out and on to the ground. Other men would stand on the ground and shovel the coal away from the car. Sometimes as many as five to eight men would be engaged in the work of unloading coal cars. The shovels were furnished by the debtor. No instructions were given the car unloaders as to how to shovel the coal from the car. Such work did not require any experience. The men who did this work, like the coal jobbers, did not work for the debtor regularly day after day but would work for a day or so and then not show up for a couple of days. The unloading of coal from cars into the yard was done to prevent demurrage on the car. Car unloaders were used only for a period of several months during the year of 1943. At the conclusion of the winter season in 1943 and thereafter, the work of unloading railroad coal cars was done by mechanical conveyor belts.

No expressed agreement or contract whatsoever existed between the debtor and the coal jobbers.

## Motion to Dismiss Appeal

The appellee herein (the debtor) has moved to dismiss the appeal on the ground that the United States must be deemed to have abandoned all of its claim for taxes except the amount which was allowed by the court. The contention is based upon the form in which the response was made to the court's declaration to the parties that it intended to hold that the "car unloaders" were employees but that the "coal jobbers" were not, so that it became necessary to itemize the tax claim theretofore treated as a single claim and segregate the items the court intended to allow from those to be disallowed. Computation of the items to be allowed in compliance with this direction from the court was made by agreement and the result was indicated to the court by the document signed by the Collector and filed in the court which identified the items of the tax claim the court had stated it would allow. Appellee contends that because the Collector entitled the document "Amended Claim" it evidenced abandonment by the United States of all of its tax claim except the amount shown in the document. He cites the rules and cases to the effect that an amended claim relates back to the original and supersedes it and constitutes an abandonment of it,[1] but we think the point is without merit. The record shows that the United States was represented on the trial of its tax claim and in the proceedings before the court by the Assistant United States Attorney and a Special Assistant Attorney General, and not by the Collector. The court required a showing in figures upon a particular issue which it had decided on principle, and the figures having been agreed to in the Collector's office the Collector had no duty except to transmit the figures. Counsel in charge of and responsible for the prosecution of the government's case had no intention of amending or reducing the tax claim. The mistaken form and labelling by the Collector of his document showing the agreed upon figures required to formulate the court's judgment amounted to a mere misnomer, and was in effect so treated by the court and counsel. The debtor's counsel gave no indication to the court that the Collector's action had caused any issue theretofore submitted to the court for its adjudication to be withdrawn or abandoned, but on the contrary, they presented to the court the findings, conclusions and order responding to all the issues presented by the government's claim and their denial thereof and so invoked the adjudication. The court being convinced that their proposed findings, conclusions and order conformed to its decision, in due course signed them as its own. Review of the judgment so entered may not be denied here because of the presence of the Collector's document in the record. Motion to dismiss is denied.

## Opinion

The question presented to us by the record on the merits is whether the so-called "coal jobbers", an itinerant group of laborers used by the debtor to store its coal in the customer's bin, were employees or independent contractors of the debtor within the intendment of Sections 1426 and 1607 of the Internal Revenue Code as amended by Joint Resolution 296, 80th Cong. 2nd Sess. Sec. 1, 26 U.S.C.A. §§ 1426, 1607.[2] There is no dispute concerning the facts found by the court relating

---

[1] Bedell v. Baltimore & Ohio R. Co., D. C., 245 F. 788; Brown Sheet Iron & Metal Co. v. Maple Leaf Oil & Refining Co. Ltd., 8 Cir., 68 F.2d 787; Grubbs v. Smith, 6 Cir., 86 F.2d 275; United States v. Gentry, 8 Cir., 119 F. 70; General Orders in Bankruptcy No. 37, 11 U. S.C.A. following section 53; Rule 15, Civil Procedure of the District Courts of the United States, 28 U.S.C.A.

[2] Internal Revenue Code:

"§ 1426 [as amended by Section 606 of the Social Security Act Amendments of 1939, c. 666, 53 Stat. 1360, and Joint Resolution 296, 80th Cong. 2nd Sess. Sec. 1] Definitions

"When used in this subchapter—

\*    \*    \*    \*    \*    \*

"(b) Employment. The term 'employment' means \* \* \* any service, of whatever nature, performed \* \* \* by an employee for the person employing him.

\*    \*    \*    \*    \*    \*

"(d) Employee. The term 'employee' includes an officer of a corporation, but

to the nature of the working relationship and the question is as to the conclusion of law to be drawn from them.

We recognize that the cases of the United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 172 A.L.R. 317, 91 L.Ed. 1947, where facts similar to those involved here were held to establish the relationship of employer and employee and not that of independent contractor, must be read in the light of the Joint Resolution of Congress subsequently passed in June, 1948, providing that the term employee does not include "any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor". We have also weighed the considerations urged for the conclusion that the "coal jobbers" here were independent contractors; that the debtor exercised no control over their physical performance; that they are not regular employees but come and go as they please; that in the main they worked only short periods of time; that they were paid so much per ton; that sometimes they refused to perform the task after accepting the assignment; that some owned their own tools, and where they did not own wheelbarrows and shovels they were not obligated to return them to debtor.

We are in accord with the conclusions stated for the Court of Appeals for the District of Columbia in Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679, loc. cit. 682, certiorari denied 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426. In discussing the relationship between the coal dealer who sold at retail and made delivery of the coal to its customers' bins through men called in that case coal "hustlers" (equivalent to the coal "jobbers" here involved), the court said: "This storage of coal is an essential, integral part of appellant's business; a customary service of retail coal dealers. Nothing could be more destructive of the good will and other intangibles upon which the success of such a business depends than improper service at the point of contact between the company and the customer.

---

such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (*except an officer of a corporation*) who is not an employee under such common-law rules."

26 U.S.C.A. § 1426.

"§ 1607 [as amended by Section 614 of the Social Security Act Amendments of 1939, supra, Sec. 1.] Definitions

"When used in this subchapter—

"(a) Employer. The term 'employer' does not include any person unless on each of some twenty days during the taxable year, each day being in a different calendar week, the total number of individuals who were employed by him in employment for some portion of the day (whether or not at the same moment of time) was eight or more.

\* \* \* \* \* \*

"(c) Employment. The term 'employment' means \* \* \* any service, of whatever nature, performed \* \* \* by an employee for the person employing him, \* \* \* except—

\* \* \* \* \* \*

"(3) Casual labor not in the course of the employer's trade or business;

\* \* \* \* \* \*

"(i) Employee. The term 'employee'

includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of *an independent contractor* or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

The amendments made by Joint Resolution 296, supra, so far as they are here pertinent, were made retroactive not only to the Internal Revenue Code in its original form but to the Social Security Act in its original form. Thus, the present definition of the term "employee" represents the law as it existed during the years here involved.

Although the amendments as made by Section 614 of the Social Security Act Amendments of 1939, supra, did not become effective until January 1, 1940, and we have here involved taxes arising under the Internal Revenue Code, Chapter 9, subchapter C, 26 U.S.C.A. § 1600 et seq., for the year 1939 we have not set forth the law applicable to that period since the changes made by the 1939 amendments do not appear substantive so far as the question here is concerned. The bulk of these taxes arose after January 1, 1940.

If a particular hustler stored coal improperly, or committed depredations on the customer's property, or otherwise misbehaved himself to the detriment of appellant's business, there was a sufficient reservation of power to compel good behavior and insure that he do his work properly, even in the absence of a written agreement. . Nothing could be more effective to this end than the simple expedient of requiring that (1) he finish the job assigned, (2) get the signature of a satisfied customer, (3) return dutifully to appellant's office, (4) present the signed card and get his money. No one who ever earned his living in such a manner would have any doubt of its efficacy, or of the power of supervision and control implicit in the arrangement. The absence of a written agreement or contract of hiring only makes the employment more hazardous for the hustler and puts him more completely under appellant's control."

We are persuaded that the relationship of the coal jobbers to the debtor is incompatible with the concept of independent contractors as that concept must be drawn from Sections 1426(d), 1607(i), and the Joint Resolution, the Treasury Regulations made since the Resolution, and the decisions.

The jobbers are far down in the scale of unskilled labor and worked solely in the affairs and to the interests of the debtor and were necessarily subject to the control of the debtor who employed them. The debtor was carrying on a long established business selling coal at retail, delivered to the bins of the customer where it was usable. The storing of the coal in the bins was a necessary part of the debtor's continuing business accomplished through the maintenance of the file of jobbers' names and addresses, calling the men and directing them concerning the work and ensuring that they were paid. Providing a waiting place of shelter from the weather, affording some degree of comfort, the debtor brought the men together at its coal yards and entered into the relationship with them. The debtor could terminate its relationship with a jobber at any time and so retained the most effective and practical control over him. The nature of the simple work and tools used in it obviated necessity for supervision or direction at the place of the work. The right to control was effectively preserved through exercise of the right of the debtor "to hire and fire."

The conclusions reached by the Court of Appeals in Grace v. Magruder, supra, were upon common law principles apart from a standard of interpretation of the Social Security and Federal Unemployment Tax statutes that was considered in the case, and we think that upon those principles the jobbers in this case were employees of the debtor. The conclusions of law to the contrary of the trial court and the order based thereon here appealed from, appear to us to be erroneous. The order is therefore reversed with direction to allow the claim of the United States for taxes in accord herewith.

Reversed with direction.