**HOOSIER HOME IMPROVEMENT COMPANY, Incorporated, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 14840.**

United States Court of Appeals Seventh Circuit.

Aug. 5, 1965.

Joseph J. Lyman, Washington, D. C., Hilgedag & Noland, Indianapolis, Ind., of counsel, for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Washington, D. C., Richard P. Stein, U. S. Atty., Indianapolis, Ind., Lee A. Jackson, David O. Walter, Stephen H. Paley, Attys., Dept. of Justice, Washington, D. C., David W. Mernitz, Asst. U. S. Atty., of counsel, for appellee.

Before KILEY and SWYGERT, Circuit Judges, and GRUBB, District Judge.

KILEY, Circuit Judge.

Hoosier Home Improvement Company sued for a refund of $3,204.00 in taxes and penalties under the Federal Unemployment Tax Act (FUTA)[1] and the Federal Insurance Contributions Act (FICA)[2] for the years 1952-54. The

---

1. Int.Rev.Code of 1939 §§ 1600, 1622.

2. Int.Rev.Code of 1939 § 1410.

Government counterclaimed for $178,-058.65 in back taxes and penalties for the same years. The issues formed by the pleadings were whether Hoosier's salesmen and siding applicators were "employees" under the Acts so as to render Hoosier liable for unemployment and Social Security contributions based on their wages. The jury found for Hoosier in the amount of $1,626.00 as to salesmen. but for the Government as to "applicators" in the amount of $90,629.70, both with interest. Both parties appealed, but the Government dismissed its appeal. We affirm the judgment against Hoosier.

Hoosier's business is the sale and installation of roofing and siding materials and storm windows and doors for frame structures. Its salesmen solicit contracts from homeowners, and after Hoosier delivers the material to the job site, the applicators affix the material to the roofs or walls.

The Supreme Court in 1947, because of a lack of decisional uniformity, in defining "employee" under the Social Security Act, decided the cases of United States v. Silk and Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), and attempted to furnish broad, general guidelines to courts and agencies in this area.[3] Because of a set of proposed Treasury Department regulations purporting to implement the rule of those cases and subsequent Congressional action in 1948 specifically adding the test of common law rules to the statutes, disagreement arose among the lower federal courts as to whether the Congressional action was designed merely to repudiate the proposed regulations or whether Congress had also repudiated the 1947 Supreme Court decisions. This court took the latter position in Party Cab Co. v. United States, 172 F.2d 87, 88–91, 10 A.L.R.2d 358 (7th Cir. 1949). But the Supreme Court, by citing United States v. Silk as controlling authority in Enochs v. Williams Packing Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), has indicated its agreement with the report of the Senate Finance Committee,[4] the Second Circuit,[5] and Professor Broden[6] that the Congressional amendments were intended as a restatement of the principle of the Silk, Greyvan and Bartels cases, that the proper standard is the common law rules "realistically applied." The definitions of "employee" under the FICA[7] and FUTA[8] are set out in the margin.

■ Relying chiefly upon Party Cab Co. v. United States, Hoosier contends that the sole criterion for distinguishing the employer-employee relationship from others not covered by the definitions is plaintiff's control or right to control the means and method by which the desired result is to be achieved, with other factors considered only as they affect the determination of the question of control in a particular case. While this court in

---

3. For the history of the difficulty for Congress, the courts and administrative agencies in defining the term "employee" under the Social Security Act in light of the common-law rules, see Broden, Law of Social Security and Unemployment Insurance, ch. 2 (1962).

4. S.Rep. No. 1255, 80th Cong., 2d Sess. 13–17 (1948), U.S.Code Cong.Service 1948, p. 1752.

5. Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Higgins, 189 F.2d 865 (2d Cir. 1951).

6. Broden, Law of Social Security and Unemployment Insurance, p. 73.

7. Int.Rev.Code of 1939 § 1607(i). "Employee. The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

8. Int.Rev.Code of 1939 § 1426(d). "Employee. The term 'employee' means—(1) any officer of a corporation; or (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee;" * * *

Party Cab said that control or right to control is the most important criterion, that factor was not the sole determinant in the decision, as the opinion shows. Justice Rutledge demonstrated in NLRB v. Hearst Publications, Inc., 322 U.S. 111, 120–130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), that there is no single common-law test of the employer-employee relationship, which may be applied independently of the purpose for which the classification is made. In defining the term "servant" in connection with tort liability (the most common application of the common-law rules), the American Law Institute lists ten different factors which, "among others," are to be considered.[9]

The term "employee" is to be construed to accomplish the purpose of the Social Security and Unemployment Tax Acts, i. e., "an attack on recognized evils in our national economy * * *" and "a constricted interpretation of the phrasing by the courts would not comport with [that] purpose." United States v. Silk, 331 U.S. at 712, 67 S.Ct. at 1467. "The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." 331 U.S. at 716, 67 S.Ct. at 1469.

■■ We disagree with Hoosier that the question before the district court was one of law. We think it was one of fact that was properly submitted to the jury.

It is not true that because the basic facts are not in dispute an inference of fact is necessarily precluded. It is not difficult to see that the term "employees" embraces a broad range of persons, from those at one end who clearly are employees, e. g., Hoosier's office employees, to those who clearly are not, e. g., a private physician treating the employees. But between these clear cases is a grey area, in which Hoosier's applicators are found, where the trier of fact must be called upon to make the determination. Service Trucking Co. v. United States, 347 F.2d 671 (4th Cir. 1965). In a situation where the decision is so dependent upon the inferences to be drawn from the facts of each case, the desired uniformity of decision, argued for by Hoosier, can be achieved only by application of the appropriate legal rules, whether by the judge as trier of fact or by the jury under proper instructions.

■ We think that on the facts in this case reasonable minds could differ as to whether Hoosier's applicators were employees, and that the record contains probative evidence capable of supporting the inference drawn by the jury, from the undisputed facts, that the applicators were employees. There is no claim that the jury was not properly instructed.

■ In the form of agreement between Hoosier and the applicators the blank space for the applicator's name is followed by the printed description "Applicating Company, Second Party." The agreement provides that the applicator will use his own "machinery and equipment"; that he will be paid upon com-

9. Restatement (Second), Agency § 220(2), "Definition of Servant
    *    *    *    *    *

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the em-

ployer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business."

pletion of the job; that he will indemnify Hoosier against any claims arising from his work; that he will insure his own employees; and that he will not represent himself as Hoosier's employee. This form agreement is clearly an attempt to create an independent contractor status, but the form of agreement does not control the factual issue. Bartels v. Birmingham, 332 U.S. at 131–132, 67 S.Ct. 1547.

Applicators were informed by a series of "Important Notices" about the manner in which work had to be done, at the risk of losing the bonus on the job, that they were to call in "collect" on days when they were not working, and that hospitalization insurance was available through a payroll deduction plan. In the case of applicators working more than fifty miles from the company office, Hoosier would pay the hotel bills. A company "expediter" was sent to inspect jobs and see that they were performed in accordance with the contract. If the work was faulty the applicator had to correct the defects without additional compensation. If his work was generally unsatisfactory, an applicator would be offered no more jobs.

The applicators did no advertising and had no business cards. Signs at the job sites identified the work as being done by the Hoosier Home Improvement Company. Applicators were paid weekly, usually on Saturday, on a piecework basis. In some circumstances the price would be negotiated or an hourly basis would be used. On some jobs a small area of the house would be covered with siding as a sample. An applicator would be paid to do this work on an hourly basis, with no assurance that he would do the full siding job.

Only experienced applicators were hired and some of them worked for Hoosier exclusively or for long periods of time. Hoosier's president testified that the applicators did not need detailed supervision and that the company's profit margin did not allow it. They supplied their own tools, which consisted of small hand and power tools costing $400 to $500. They also usually supplied their own transportation, but occasionally they would use Hoosier's trucks.

Although not required to accept jobs which were offered to them, one of the applicators testified that he was told, not asked, to take the next job, and another one testified that he left Hoosier because he did not know that he could reject jobs. In a letter to one who had left the company, Hoosier's president appealed to company loyalty, pointed out the prospects for continued growth, and asked him to come back to work.

Hoosier contends that its motion for a directed verdict on the counterclaim should have been granted for failure of the Government to sustain its burden of proof.

█ At the conclusion of the evidence Hoosier moved to dismiss the counterclaim for failure to prosecute. Counsel for both sides then agreed that the issue under both the complaint and counterclaim was whether the salesmen and applicators were employees and that the proof should be opened to permit the Government to introduce the notice of deficiency. Hoosier then resubmitted all of its evidence. It now argues that the presumption of correctness of the deficiency assessment disappeared with the introduction of its evidence and that the failure of the Government to reply entitled it to the directed verdict. The procedure was agreed to by Hoosier and no objection was made to it in argument to the district court on the motion for directed verdict. We do not think the issue is properly raised here.

The judgment is affirmed.