**AIR TERMINAL CAB, INC., Appellee,**

v.

**UNITED STATES of America, Appellant.**

**AIRWAY TAXI COMPANY, INC., Appellee,**

v.

**UNITED STATES of America, Appellant.**

No. 72–1348.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1973.

Decided April 30, 1973.

Rehearing and Rehearing En Banc Denied May 22, 1973.

**576**

Wesley Filer, Atty., Dept. of Justice, Washington, D. C., for appellant.

William I. Rutherford, St. Louis, Mo., for appellees.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

The question before the Court is whether drivers of respondent's taxicabs are employees within the provisions of the Federal Insurance Contributions Act (FICA) (26 U.S.C. § 3101 et seq.) and the Federal Unemployment Tax Act (FUTA) (26 U.S.C. § 3301 et seq.), which impose taxes on employers to finance government benefits for employees.

These consolidated cases are suits for refund by two taxicab companies of partial payment of an assessment of withholding, FICA and FUTA taxes, penalties and interest allegedly owed by the plaintiffs. The plaintiff taxpayers have each paid one quarter of the alleged liabilities under protest.[1] The Government counterclaimed below for alleged liabilities for other quarters. The years in question are 1965 through 1968. The District Court for the Eastern District of Missouri, Judge Wangelin presiding, found that the taxicab drivers were not employees for purpose of federal income tax withholding, FICA and FUTA taxes. Air Terminal Cab, Inc. v. United States, 341 F.Supp. 1257 (E.D.Mo.1972).

The resolution of the question whether the taxicab drivers are employees must be made by applying common law definitions of "employee" and "independent" contractor. It was thought by some that the decisions in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) resulted in a more relaxed meaning of the term "employee" as used in the tax statutes. Shortly after those decisions, however, Congress amended the definition sections of the pertinent acts to make it clear that the term "employee" should be read "under the usual common law rules." 26 U.S.C. § 3121(d)(2) and § 3306(i). See H.Conf.Rep.No. 2771, 81st Cong. 2d Sess. p. 104. See also, Hoosier Home Improvement Company v.

---

1. Alleged liability for Air Terminal for all taxes due is stipulated to be $71,235.02. Airway's liability is $60,778.86.

United States, 350 F.2d 640, 642 (CA 7 1965).

The working relationship between the taxicab drivers and the appellees is undisputed and the facts are fully stipulated. The pertinent facts necessary for determination of the issue are as follows: Appellees, Air Terminal Cab, Inc. (Air Terminal) and Airway Taxi Company (Airway) are corporations organized and existing under and by virtue of the laws of Missouri. The method of operation of the two companies is substantially similar, but each is separately owned and operated. The two companies obtained franchises from St. Louis County to operate a specified number (12 each) of taxicabs within that county. Their cabs can only pick up passengers within the unincorporated areas of St. Louis County. The primary source of passengers in this restricted area is Lambert Airfield where passengers are picked up by the taxicabs waiting in line. The County granted franchises to appellees whose businesses involve company owned cabs operated by drivers who receive their compensation by retaining a percentage of the fares collected.

The companies do not have formal business offices but are operated from the homes of their respective presidents. They do not advertise nor do they have listed telephone numbers in the telephone directory. The taxicabs owned by the companies are not radio equipped, nor is there any kind of an operational dispatcher system. The drivers do not regularly report their whereabouts, nor do they receive instructions from the company presidents. The presidents may, if it becomes necessary to contact a driver, leave messages at the service stations where the taxicabs are left overnight, or they may call the drivers at their homes after working hours.

The taxicabs used in the businesses were owned and insured for liability by appellees. The drivers do not carry any insurance on their operation of the taxicabs. They are equipped with fare meters and have the company name, either "Lambert Airfield Cab, Co." or "Lambert Airport Cab, Co." painted in black letters on the door. When not in use, the taxicabs owned by each company are parked at separately owned service stations, in return for which each company contracts out to the particular service station the minor maintenance work needed on the taxicabs.

During the years in suit—1965 through 1968—the drivers of the companies' taxicabs operated in the following way:

(a) At the beginning of their shifts, each of the drivers pick up the taxicab he is to drive at the service station where the particular driver's company keeps the taxicabs pursuant to the maintenance-parking arrangement described above.

(b) From the service station, the drivers usually proceed directly to Lambert Airfield to pick up fare-paying passengers.

(c) After a passenger has been left at his destination, the drivers usually return directly to Lambert Airfield to pick up another fare-paying passenger. A driver makes an average of six (6) trips a day, consisting of transportation of a passenger from Lambert Airfield to the passenger's destination and return to the Airfield.

(d) The drivers maintain a trip sheet on which is to be noted the pick up point and destination of each fare-paying passenger and the amount of the fare paid by each passenger.

(e) At the end of the shift, each driver deducts from the total amount of fares collected, the amount expended for gasoline and oil. The amount remaining is then divided equally between the company and the driver. The driver takes the company's share and puts it in an envelope then along with the trip sheet drops the envelope through a slot in a metal strong box at the service station where the taxicabs are parked when not in use. The driver retains his own share of the

fares collected and receives no other remuneration. These envelopes are picked up regularly by the president of the company. The trip sheets and envelopes are furnished to the drivers by the companies.

(f) The drivers do not use the taxicabs for their personal use. At the end of their shift, the drivers return the taxicabs to the service station to be parked and left until the next shift.

The drivers who drive the taxicabs owned by the plaintiff companies, as well as drivers for other taxicab companies in the St. Louis and St. Louis County areas, are organized into and are members of Local 688 Warehouse und Distribution Workers Union, affiliated with the International Brotherhood of Teamsters, Chauffeurs and Warehousemen of America. Pursuant to contracts entered into with Local 688, effective September 1, 1965 and extending through 1968, "owner-drivers" [2] are regarded as employees of taxpayers and taxpayers reserve "the right to control the manner, means and details of, and by which the owner-operator performs his services, as well as the ends to be accomplished."

The drivers are required to work a minimum of nine hours per day, five days per week pursuant to the union contract. They may work a maximum of 14 hours per day and six days per week. In addition, starting times and days to be worked are set by taxpayers. After drivers have completed one year of work they are entitled to a one-week paid vacation, sick leave benefits, and specified paid holidays. Article XII of the union contract gives the companies the right to discharge drivers pursuant to the union grievance procedure.

The issue of whether an employer-employee relationship exist for purposes of employment taxes has generally been held to be one of fact. Saiki v. United States, 306 F.2d 642, 648 (CA8 1962); American Consulting Corp. v. United States, 454 F.2d 473, 477 (CA3 1971); Lanigan Storage & Van Co. v. United States, 389 F.2d 337, 340–341 (CA6 1968); Lifetime Siding, Inc. v. United States, 359 F.2d 657, 662 (CA2 1966); Hoosier Home Improvement Co., Inc. v. United States, 350 F.2d 640, 643 (CA7 1965); McGuire v. United States, 349 F.2d 644, 646 (CA9 1965); Service Trucking v. United States, 347 F.2d 671, 672 (CA4 1965).

In the instant case the trial court likewise held it was a question of fact, stating at page 1263 of 341 F.Supp.:

"The question of plaintiffs' control over the manner and means of the operation of the taxicab is a *factual question*. Considering all factors, the Court concludes that the plaintiff had little, if any, control over the means and method by which the drivers performed their services." (emphasis added)

However, this Court has not hesitated to reverse where the evidence did not support the conclusion reached by the trier of fact. Saiki v. United States, *supra*, 306 F.2d 642, 652 (CA8 1962); United States v. Kane, 171 F.2d 54 (CA8 1948).

Where the facts are stipulated "and there is no conflict in the evidence, or in the inferences which reasonably can be drawn therefrom, this Court may rule upon the question of law presented and is not restricted by the limitation of Rule 52(a) F.R.Civ.Proc." United States v. Kavanaugh, 308 F.2d 824, 828 (CA8 1962); United States v. Mississippi Valley Barge Line Co., 285 F.2d 381, 388 (CA8 1960); Compare, Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960);

---

2. Appellees in their brief contend that the term "owner-drivers" found in the labor contract excludes their drivers because they do not own their own taxicabs. We agree. Read in its entire context, the labor contract's use of the term refers only to situations where the driver owns his own cab. Other parts of the labor contract, however, do apply to the appellees' drivers.

Azad v. United States, 388 F.2d 74, 78 (CA8 1968).

Moreover, even if we would apply the "clearly erroneous" rule, the Supreme Court has pointed out that "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. U. S. Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In the case at bar the facts are largely stipulated and there is no dispute as to them. Whether the question for determination is viewed as one of fact or law, we are convinced that under applicable standards a mistake has been committed in the result arrived at by the trial court.

This Circuit has not directly passed on the question of whether a taxicab driver is an employee for federal employment tax purposes. The two leading cases in this area appear to be Party Cab Company v. United States, 172 F.2d 87 (CA7 1949), cert. denied, 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949) and United States v. Fleming, 293 F.2d 953 (CA5 1961). In *Party Cab* the taxicab drivers worked essentially on a rental basis whereby they paid a fixed fee for the use of a cab and were subject to little control over their daily routine other than fixed *working* hours. The court held that the drivers were not employees for employment tax purposes. In *Fleming*, the drivers were directed to pickups by radio dispatcher calls, were required to account for their trips by use of trip reports, were subject to discharge, did not pay for their own gas and oil, and were required to split their fares with the company (65% to the company). In finding that the taxicab drivers were employees, the court in *Fleming* relied heavily on the fare-splitting arrangement between the drivers and the company. 293 F.2d at 957. The court there stated:

"The large measure of control here present, the operation by the Company of a taxi *business* rather than merely a *renter* of cabs, and other factors require a determination that the employer-employee relationship existed." (emphasis added)

We stated, *supra*, that common-law tests are to be used to determine the status of the taxicab drivers. These common law tests mentioned in the Internal Revenue Code sections here involved, 26 U.S.C. §§ 3121(d)(2) and 3306(i), are elaborated in corresponding sections of the Treasury Regulations, 26 C.F.R. §§ 31.3121(d)–1 and 31.3306(i)–1, which provide:

"Generally such relationship exists [of employer-employee] when the person for whom services are performed has the *right* to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, *it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.* The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services."

\* \* \* \* \* \*

"Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case." (Emphasis added.)

Thus, control, either actual or the right to it, is the basic test used to determine the relationship in question. Here there were no supervisory employees, no officers, no garages, no radi-

os, no dispatchers, no telephones, and no regular contact between appellees and their drivers. On the other hand, the drivers had regular working hours, were limited as to where they could pick up customers, could not use cabs for their personal use, were required to account for fares by submitting "trip sheets," and were required to split (after deducting amounts spent for gas and oil) their fares evenly with appellees. This arrangement closely resembles that in *Fleming, supra,* where the court held that the taxpayers were conducting a business as a common carrier with employees rather than the rental operation as found in *Party Cab, supra.* The Internal Revenue Service has also ruled that the receipt or fare sharing arrangement diminishes the likelihood of a true lessor-lessee relationship because of the company's interest in receipt of the maximum amount of income possible in return for its financial risks. Rev.Rul. 71–572, 1971–2 Cum.Bull. 347.[3] Where a company has a general measure of control over the manner in which services of their taxicab drivers are performed, such as operation in a restricted territory, control of hours worked, and the governing of income to the drivers, the employer-employee relationship exists for purposes of the federal employment taxes. *Cf.* Westover v. Stockholders Publishing Co., 237 F.2d 948 (CA9 1956).

Even if actual control was absent, it is the *right* to control which is determinative. In McGuire v. United States, 349 F.2d 644, 646 (CA9 1965) the court stated:

> "The absence of need to control should not be confused with the absence of right to control. The right to control contemplated by the Regulations relevant here and the common law as an incident of employment requires only such supervision as the nature of the work requires."

Where the nature of a person's work requires little supervision, there is no need for actual control. Some occupations such as unloaders, see *McGuire, supra*; United States v. Kane, 171 F.2d 54, 59 (CA8 1948), or doctors, Cody v. Ribicoff, 289 F.2d 394 (CA8 1961); Flemming v. Huycke, 284 F.2d 546 (CA9 1960), are unsuited to direction and close control by an employer. In the instant case, the nature of appellees' businesses simply do not require close hour by hour supervision, but the right to control is not lacking.[4]

Other factors in this case lead us to believe that the employer-employee relationship exists. The cab drivers have no capital investment in the busi-

---

3. Revenue Ruling 71–572 was issued in 1971 *after* the appellees filed their suits for refund on May 21, 1971.

 Attached to the stipulation of facts in the record is a letter ruling by the Internal Revenue Service to the District Director of St. Louis, Mo., which pertains to Laclede Cab Co. and Red Top Cab Company which also operate under franchises in St. Louis County. Appellee relies on this letter for support. In those situations. a daily rental fee was paid by the drivers for the use of the taxicabs. The drivers could use the taxicab for a maximum shift, obtain orders from the company's radio dispatcher and generally operate as a taxicab. There was a union contract, similar to those herein. The driver, however, paid all expenses and retained for himself all fares. It was held by the I.R.S. that the Laclede and Red Top drivers were not employees for employment tax purposes. The instant case is distinguishable, however, in the method that the financing is arranged. The Laclede and Red Top drivers rented the taxicabs and ran their own business, quite similar to the *Party Cab* case. The fare-splitting arrangement in the instant case is similar to Fleming where a similar arrangement resulted in the employer-employee relationship.

4. Appellees base much of their argument on the fact that the taxicabs are not equipped with two-way radios or any kind of a dispatcher system. The nature of the appellees' businesses is such that such a system is unnecessary because almost all passengers are picked up at the airport on a random basis. This feature is not determinative of control. Almost all of the taxicab cases we have read involve a dispatcher system of some type, but the decisions have gone both ways.

ness. They do not even supply their own oil or gas. All they provide is their labor since the company owns the taxicabs and purchases liability insurance. Daily reporting sheets must be submitted by the drivers to the company. The appellees may discharge the drivers for cause pursuant to the labor contract. See Treasury Regulations, *supra*. Moreover, the companies provide fringe benefits such as paid vacations and holidays, sick leave, and pension plans. All of these are consistent with an employer-employee relationship.[5] These taxicab drivers were performing personal services constituting an integral part of appellee's business operations. They were not pursuing any separate trade, business, or profession involving capital outlay and were subject to general control over the manner and means of performing their services. They were, in effect, common-law employees for purposes of federal employment taxes here involved.

Reversed.

---

5. *See* Restatement (Second) of Agency § 220 (1958) for a summary of common law factors to be considered in finding the employer-employee relationship. Missouri has accepted the criteria set out in the Restatement of Agency for determining whether or not an employer-employee relationship exists. Dean v. Young, 396 S.W. 2d 549, 553 (Mo.1965). The element of control, or right to control is most frequently used in Missouri cases as distinguishing a servant from an independent contractor. *Id.* Thus, Missouri's common law on this issue is consistent with the federal law.