T.C. Memo. 1995-555


UNITED STATES TAX COURT


ERTAN AND SUSAN EREN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 866-94.          Filed November 21, 1995.


<u>James Daniel McCarthy</u>, for petitioners.

<u>Aretha Jones</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined a $15,459 deficiency in petitioners' 1989 Federal income tax.  The sole issue for decision is whether petitioner Ertan Eren's 1989 income from the U.S. Department of State, Office of Foreign Buildings Operations (FBO), qualifies for the section 911 foreign earned income exclusion.

Petitioners' entitlement to such exclusion depends upon the classification (independent contractor vis-a-vis employee) of Ertan Eren's employment relationship with FBO during the year under consideration. For the reasons set forth herein, we hold that such relationship was that of an employee with the consequence that petitioners are not entitled to the claimed section 911 foreign earned income exclusion.

All section references are to the Internal Revenue Code for the year under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

Petitioners Ertan and Susan Eren, husband and wife, resided in Rockville, Maryland, at the time they filed their petition. They filed a joint Federal income tax return for 1989.

Ertan Eren is an architect[1]. He resided in Bogota, Colombia, from July 1988 through June 1990. At that time, he worked for FBO as project director for the construction of an annex to the U.S. Embassy in Bogota.

---

[1] All references to petitioner in the singular will be to Ertan Eren.

Petitioner's Contracts with FBO

During the late 1970's and early 1980's, petitioner rendered architectural services to FBO on an "as needed" basis under a labor hour contract for various FBO projects in Brazil. He signed his first personal service contract (PSC) with FBO in 1983, and has been performing services solely for FBO since that time. His subsequent contracts with FBO have been renewed, modified, or renegotiated on an annual basis.

On March 6, 1984, petitioner and FBO signed a contract designating petitioner as the project manager[2] with respect to the improvements and repairs at the U.S. Embassy in Ankara, Turkey, and other U.S. foreign service posts. Petitioner worked in Turkey for a number of years under modified versions of this PSC. In July 1988, he was transferred from Turkey to Bogota.

Petitioner's contract with FBO, as in effect during 1989, states in part: "The Project Manager will inspect construction, improvements and/or repairs at project sites and will be directly responsible to FBO in the performance of his duties under this contract." The contract provides that petitioner will "Perform appropriate functions and obligations in accordance with procedures or other directives issued by the Contracting Officer or his designee."

---

[2] The term "project manager" and "project director" are used interchangeably herein.

Petitioner's Duties in Bogota

As project director for the Bogota annex, petitioner was responsible for the inspection and supervision of the construction of such annex. He was not subject to daily supervision by FBO.

FBO provided petitioner with a "Project Director's Handbook", which he was to use as a guide in performing his duties. Petitioner was required to personally perform his duties to FBO on a full-time basis. He was required to work a minimum of 40 hours a week; however, he typically worked longer hours. Petitioner was not paid for the extra hours he worked.

FBO provided petitioner with all requisite contract documents, specifications, and drawings for the annex construction. Petitioner did not have authority to change the documents.

Petitioner was appointed a contracting officer's technical representative (COTR) pursuant to a memorandum dated November 10, 1988. The memorandum outlined 11 specific duties and activities that petitioner had to perform as COTR. Primarily, petitioner was required to insure that all materials furnished, and the work performed, on the Bogota annex project were in accordance with the contract specifications and that the work progressed on schedule.[3]

---

[3]    Petitioner had substantial control over the contractor hired to build the annex. He was able to order work redone or stopped  because of the contractor's failure to follow accepted safety procedures or project specifications without prior FBO approval. Before authorizing FBO to pay the contractor,
(continued...)

Petitioner was required to maintain a daily log describing the work progress on the construction site.

Pursuant to a February 21, 1989, memorandum that supplemented the November 10, 1988, memorandum, petitioner was given authority to substitute materials, equipment, and/or products for the construction of the Bogota annex so long as they were equal to or better than those specified in the contract, and the substitution did not entail an additional cost to the government.

During the year under consideration, petitioner was required to submit two types of monthly reports regarding the progress of the construction of the Bogota annex to the FBO area branch chief for construction management. One was a telegraphic report that had to be sent before the 10th of each month; the other was a written report kept in book form. The reports included statements of progress and problems incurred or anticipated in the construction of the annex. FBO had the right to terminate petitioner's contract if he failed to submit these monthly reports.

The Bogota Project Budget

When petitioner was assigned to a project post, he was required to prepare a budget proposal and submitted it to FBO for approval. With regard to the Bogota annex project, FBO approved

---

³(...continued)
petitioner inspected the job site to ensure that the contractor was performing satisfactory work.

petitioner's request for $250,000 for 1989.  Although petitioner did not have authority to exceed the approved budget, he could allocate approved budget funds as necessary.

The $250,000 budget for 1989 did not include petitioner's $74,000 salary.  His biweekly salary was based on a Government schedule (the Foreign Service Schedule).  Petitioner did not receive any per diem in 1989.

Petitioner had the authority to hire and fire his staff without FBO approval.  He hired several workers who entered into contracts with FBO and were paid by FBO.

PSC Provisions

Petitioner did not receive standard Government employee benefits such as life insurance and retirement benefits under the terms of his 1989 PSC.  Rather, 5 percent of his compensation was allocated for purchasing health insurance. Petitioner received home leave,[4] sick leave, and annual leave.

Department of State Directives and Memorandum

Two FBO directives required that personal service contractors be treated as employees.  The first directive, issued July 7, 1987, refers to the Foreign Affairs Manual, which states that "a personal service contractor is not eligible for the 'foreign earned income exclusion'".  The second, issued July 7, 1987 (and revised on

---

[4]    Home leave is a mandatory Department of State leave for foreign service workers.

December 4, 1987, and December 20, 1988), provides that overseas PSC's treat a contractor as an FBO government employee for all purposes except retirement.

Petitioner was notified by a December 12, 1989, FBO memorandum that as a result of an Internal Revenue Service review of FBO personnel policies, it was determined that PSC's signed by FBO contractors created an employee-employer relationship between the parties and that petitioner should designate himself as an FBO employee (rather than as an independent contractor) on his 1989 Federal income tax return.

Subsequent to the issuance of this memorandum, FBO issued petitioner a Form W-2 for "wages, tips and other compensation" in the amount of $74,183.04. FBO withheld Social Security tax from petitioner's income in the amount of $3,604.80.

Petitioners' 1989 Federal Income Tax Return

On petitioners' 1989 Form 1040, petitioners reported $74,183 as "business income" on line 12 and then subtracted $70,000[5] on line 22 ("other income") with the notation "Exclusion from Form 2555."[6] Thus, petitioner claimed a section 911 exclusion for a

---

[5] The maximum amount permitted for the earned income exclusion was $70,000.

[6] Form 2555, Foreign Earned Income, attached to petitioners' 1989 return, reported foreign earned income of $74,183, and listed "name of employer" as "self".

substantial portion of the compensation he received from FBO. Respondent disallowed the claimed exclusion.

Petitioner also calculated self-employment tax on Form SE in the amount of $6,250. Respondent concedes that petitioner is not liable for self-employment tax if we hold that he was an employee of FBO in 1989.

## ULTIMATE FINDING OF FACT

Petitioner was an FBO employee in 1989.

## OPINION

At issue is the characterization for tax purposes of petitioner's relationship with FBO during 1989. Petitioner argues that his relationship with FBO in 1989 was that of an independent contractor and therefore petitioners are entitled to exclude $70,000 of his 1989 income from FBO as "foreign earned income" within the purview of section 911(b)(1)(B)(ii). Respondent contends that petitioner's relationship with FBO in 1989 was that of an employee and therefore petitioners are not entitled to the exclusion.

Section 911 provides in relevant part:

> (a) Exclusion from Gross Income.--At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year--
>
> (1) the foreign earned income of such individual, and

(2) the housing cost amount of such individual.

(b) Foreign Earned Income.--

(1) Definition.--For purposes of this section--

(A) In General.--The term "foreign earned income" with respect to any individual means the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable.

(B) Certain Amounts Not Included In Foreign Earned Income.--The foreign earned income for an individual shall not include amounts--

\* \* \* \* \* \* \*

(ii) paid by the United States or an agency thereof to an employee of the United States or an agency thereof * * *

The term "employee" is not defined in the Code; therefore, common law rules must be applied to determine whether an individual is an employee. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992); Matthews v. Commissioner, 92 T.C. at 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); Simpson v. Commissioner, 64 T.C. 974, 984 (1975). Whether an employer-employee relationship[7]

---

[7] Sec. 31.3401(c)-1(b), Employment Tax Regs., defines an (continued...)

exists is a question of fact. <u>Air Terminal Cab, Inc. v. United States</u>, 478 F.2d 575, 578 (8th Cir. 1973); <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). If an employer-employee relationship exists, its characterization by the parties as some other relationship, such as independent contractor, is of no consequence. Sec. 31.3121(d)-1(a)(3), Employment Tax Regs.

---

[7](...continued)
employer-employee relationship as follows:

> (b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he [or she] has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he [or she] is not an employee.

This Court has enumerated the following factors[8] in determining whether an employee-employer relationship exists: (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating. Weber v. Commissioner, 103 T.C. 378, 387 (1994), affd. per curiam 60 F.3d 1104 (4th Cir. 1995); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 232; Simpson v. Commissioner, supra at 984-985; see also United States v. Silk, 331 U.S. 704, 716 (1947). No single factor is dispositive. Simpson v. Commissioner, supra at 985. All of the facts and circumstances must be studied. Professional & Executive Leasing, Inc. v. Commissioner, supra at 232.

While all of the above factors are important, the "right-to-control" is the "master test" in determining the nature of a working relationship. Matthews v. Commissioner, 92 T.C. at 361. Both the control exercised by the alleged employer and the degree to which the alleged employer may intervene to impose control must

---

[8] The parties cite Rev. Rul. 87-41, 1987-1 C.B. 296, which lists 20 factors to consider in determining whether a common law employer-employee relationship exists. Many of these factors are incorporated into this Court's seven factors.

be examined. <u>Radio City Music Hall Corp. v. United States</u>, 135 F.2d 715, 717 (2d Cir. 1943); <u>deTorres v. Commissioner</u>, T.C. Memo. 1993-161. "[N]o actual control need be exercised, as long as the employer has the right to control." <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 862 F.2d at 753. In order for an employer to retain the requisite control over the details of an employee's work, the employer need not direct each step taken by the employee. <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 89 T.C. at 234; <u>Gierek v. Commissioner</u>, T.C. Memo. 1993-642. The exact amount of control required to find an employer-employee relationship varies with different occupations. <u>United States v. W. M. Webb, Inc.</u>, 397 U.S. 179, 192-193 (1970). In fact, the threshold level of control necessary to find employee status is in most circumstances lower when applied to professional services than when applied to nonprofessional services. <u>Azad v. United States</u>, 388 F.2d 74, 77 (8th Cir. 1968); <u>Professional and Executive Leasing, Inc. v. Commissioner</u>, <u>supra</u> at 234. "From the very nature of the services rendered by * * * professionals, it would be wholly unrealistic to suggest that an employer should undertake the task of controlling the manner in which the professional conducts his activities." <u>Azad v. United States</u>, <u>supra</u>; <u>Weber v. Commissioner</u>, 103 T.C. at 388. An alleged employer's control "must necessarily be more tenuous and general

than the control over nonprofessional employees". <u>James v. Commissioner</u>, 25 T.C. 1296, 1301 (1956).

We begin our analysis of the seven factors enumerated above with the control factor. The record contains numerous illustrations of FBO's right to control petitioner and its actual control over him. Petitioner's contract with FBO during the year under consideration stated that petitioner "will be directly responsible to FBO in the performance of his duties under this contract." While petitioner was permitted to hire and fire his staff, and order substitutions of materials, FBO did not permit him to deviate from the construction documents or exceed the budget. Further, he was required to follow a Project Director's Handbook.

FBO also controlled petitioner by dictating his hours, pay, and leave. FBO required petitioner to work full time, a minimum of 40 hours a week. Petitioner's biweekly FBO salary was based on the Foreign Service Schedule. In addition to his salary, FBO permitted petitioner to earn and accrue home leave, annual leave, and sick leave.[9]

Petitioner also was required to maintain a daily log of the progress of the construction project, and submit both oral and written reports to FBO. These monthly reports were not optional;

---

[9]     While petitioner had to pay for his own health insurance and did not accrue retirement benefits, we do not believe such facts preclude a holding that petitioner was an FBO employee.

if petitioner failed to submit such reports, FBO had the right to terminate his contract.

We are satisfied that petitioner was subject to substantial control by FBO. Although petitioner worked for FBO in a professional capacity, which would limit the amount of control FBO had over petitioner's day-to-day activities,[10] FBO dictated the contract documents and drawings, budget, hours, and monthly reports with which petitioner was required to comply. We therefore conclude that FBO had the right to exercise control over petitioner and in fact exerted a substantial amount of control over him. See James v. Commissioner, supra.

We now turn to the other factors. With respect to the second factor, petitioner had no investment in the work facilities; rather, FBO provided petitioner with office space and staff assistance. See Professional & Executive Leasing v. Commissioner, 89 T.C. at 234. FBO entered into contracts with petitioner's staff and paid their salaries.

As to the third factor, petitioner had no opportunity for profit or loss. The pay he received depended only upon the number

---

[10] Petitioner argues that he was not an employee because he scheduled his own daily activities. We believe that petitioner's ability to schedule his activities only demonstrates that in connection with professionals less supervision is necessary. See Azad v. United States, 388 F.2d 74, 77 (8th Cir. 1968).

of days he worked. The amount FBO paid petitioner was not dependent upon completion of the project.

As to the fourth factor, while FBO had the right to discharge petitioner without cause with a 30-day notice, petitioner also could terminate the contract.

As to the fifth factor, FBO was in charge of constructing U.S. Government buildings overseas. Petitioner's assignment in Bogota during the year under consideration was to oversee the construction of an annex to the U.S. Embassy. This type of work was clearly within the scope of FBO's regular business.

As to the sixth factor, we believe that the relationship between petitioner and FBO was intended to be somewhat permanent as opposed to transitory. Petitioner had been working solely for FBO since 1983. He was required to personally perform the services of project director designated in his contract with FBO. He did not offer his services to the public and did not perform services for any individual or entity other than FBO, as would an independent contractor. See Jacobs v. Commissioner, T.C. Memo. 1993-570; Casety v. Commissioner, T.C. Memo. 1993-410; Gamal-Eldin v. Commissioner, T.C. Memo. 1988-150, affd. without published opinion 876 F.2d 896 (9th Cir. 1989).

Finally, as to the seventh factor, the type of relationship the parties intended to create when they signed various modifications to petitioner's contract is not clear. However, in

December 1989, FBO provided petitioner with a Form W-2 and withheld Social Security tax from petitioner's income. This, in our opinion, indicates that FBO intended to create an employer-employee relationship. See, e.g., Juliard v. Commissioner, T.C. Memo. 1991-230. Further, FBO Policy and Procedures Directives in effect during the year under consideration provided that a personal services contractor is not eligible for the foreign earned income exclusion, and that overseas PSC's treat the contractor as an FBO government employee for all purposes except retirement. And, petitioner was advised by the December 12, 1989, FBO memorandum that he should designate himself as an FBO employee on his 1989 return.

After considering all the facts and circumstances present in this case, we conclude that petitioner was an FBO employee in 1989. Therefore, petitioners are not entitled to the foreign earned income exclusion under section 911(a) for such year.

To reflect the foregoing and respondent's concession,

Decision will be entered

under Rule 155.