T.C. Memo. 2000-375


UNITED STATES TAX COURT


ROBERT PATRICK DAY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7118-98.                    Filed December 13, 2000.


Robert Patrick Day, pro se.

<u>Tracy Anagnost Martinez</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  This case is before the Court on a petition
for a redetermination of a Notice of Determination Concerning
Worker Classification Under Section 7436.[1]

———————————

[1]Section references are to the Internal Revenue Code in
effect for the taxable year in issue, and all Rule references are
to the Tax Court Rules of Practice and Procedure, unless
otherwise indicated.

The issues for decision are: (1) Whether the individuals (the drivers) who drove petitioner's trucks[2] during 1995 were employees of petitioner or independent contractors. We hold they were employees. (2) Whether petitioner is eligible for relief provided to employers by section 530 of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2885 (section 530). We hold he is not.

## FINDINGS OF FACT

At the time the petition in this case was filed, petitioner resided in Mazeppa, Minnesota.

During 1995, petitioner owned or leased five or six trucks and operated a sole proprietorship called Dayline Trucking (the company). Petitioner's business consisted of hauling freight mainly between North Dakota and Texas and to the east coast.

Petitioner recruited drivers to operate his trucks through newspaper advertisements and by word of mouth. Usually, at the time he hired a driver, petitioner already had contracted with a broker or a shipper for a load to be transported to a particular destination. Every driver that petitioner hired held a commercial license to operate a truck and had performed satisfactorily on a short test drive conducted by petitioner. In

_____

[2]A trucking rig is made up of a tractor and a semitrailer. For convenience, and to avoid confusion of petitioner's vehicles with an agricultural implement, we refer to the tractors and semitrailers in this case as trucks.

the year at issue, petitioner had 11 drivers who operated his vehicles.

Petitioner had the right to discharge the drivers, and the drivers had the right to quit, at any time. During the year at issue, most of the drivers worked only a few months for petitioner.

The driver chose the route to take between the point where he engaged the load and the destination point, and also which hours he would drive and rest. If the driver delivered the load late, the company, not the driver, was liable for any penalties.

Petitioner required the drivers to call him daily while they were on the road to inform him of their progress so that he could arrange timely loads near the delivery points for the drivers to haul on the return trips. Petitioner provided each driver with a cellular telephone for that purpose, and petitioner paid the expense of these telephone calls.

On the occasions that a driver delivered a load to a place where petitioner had not been able to arrange a return load, the driver would try to find a load by contacting a broker or by consulting the "load board" at a truck stop. On these occasions, the driver would call petitioner for approval of the terms of the haul before engaging the load. The contract for the transportation of the freight always was between the company and the broker; the contract was never between the driver and the

broker.  The driver was never paid for the time spent locating a return load, and the driver was always responsible for his own living expenses while on the road.  Almost without exception, the drivers slept in the trucks rather than in motels.

Petitioner paid the drivers 25 cents per mile for driving a truck hauling a load, whether the driver or petitioner arranged for the load, and, usually, 12-1/2 cents per mile for driving a truck pulling an empty semitrailer.  Some shipments were required to be off-loaded upon delivery.  In these instances, petitioner allowed the driver $50 to $100 to hire a "lumper" to perform the offloading; however, if a driver preferred to do the work himself, the driver would be paid the lumper's fee.

Petitioner paid the acquisition and maintenance costs of the trucks and all operating expenses including insurance, fuel, oil, repairs, tolls, and scale charges.  The drivers provided their commercial driver's licenses and carried their own mechanic's tools, which they used occasionally to make minor repairs to the trucks (e.g., replace a burned-out flasher or fuse) while in transit.

If a truck required a repair that prevented the operation of the vehicle, e.g., a tire blowout, the driver would turn the truck over to a professional truck mechanic for the repair work.  In these instances, petitioner would authorize the repair over the telephone.  If a truck had a mechanical problem that did not

prevent its operation, the driver would inform petitioner of the problem, and petitioner would decide whether to have the truck repaired while in transit or after the truck returned to petitioner's place of business. In either event, petitioner paid for the repair.

If the truck was involved in an accident, the company was liable for any loss not paid by insurance for the damage to the trucking rig or freight. The driver was responsible for the payment of fines imposed for driving violations.

Drivers were provided a "Comcheck" to pay expenses incurred while hauling the freight. A Comcheck has a number code that the driver submits at truck stops to pay for fuel, oil, and other necessary expenditures. The driver may also use the Comcheck to draw cash advances and to pay for personal items, such as food. At the end of the run, the driver reconciled the sum of the cash advances and the amounts spent on personal items against the amount earned for driving the truck; then either petitioner paid the driver the balance owed or the driver repaid petitioner the amount overdrawn. If a driver submitted incomplete records to petitioner for the miles driven, the loads hauled, and expenses incurred, petitioner charged the driver $25 to $100 to complete the paperwork.

For employment tax[3] purposes, petitioner treated all the drivers as independent contractors, rather than as employees, and issued every driver a Form 1099 instead of a Form W-2. Most of the drivers working for petitioner considered themselves to be employees, but some considered themselves independent contractors.

OPINION

Issue 1.  Whether the Drivers Are Employees or Independent
          Contractors

Respondent determined that for employment tax purposes the drivers of petitioner's trucks during 1995 were employees, not independent contractors. Relying mainly on his own previous experiences as a driver and his interpretation of a State multiple-factor test, petitioner asserts that the drivers of his trucks were independent contractors.

Respondent's determinations of fact are presumptively correct, and petitioner bears the burden of proving by a preponderance of the evidence that those determinations are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Day v. Commissioner, 975 F.2d 534, 537 (8th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991-140.

---

[3]For convenience, we use the term "employment tax" to refer to taxes under the Federal Insurance Contributions Act (FICA), secs. 3101-3125, the Federal Unemployment Tax Act (FUTA), secs. 3301-3311, and income tax withholdings, secs. 3401-3406 and 3509. See Henry Randolph Consulting v. Commissioner, 112 T.C. 1, 1 n.1 (1999).

These general principles apply to the Commissioner's determination that a taxpayer's workers are employees. See Boles Trucking, Inc. v. United States, 77 F.3d 236, 240 (8th Cir. 1996); Kiesel v. United States, 545 F.2d 1144, 1146 (8th Cir. 1976); see also Air Terminal Cab, Inc. v. United States, 478 F.2d 575, 578 (8th Cir. 1973) ("The issue of whether an employer-employee relationship exists for purposes of employment taxes has generally been held to be one of fact.").

For the purposes of employment taxes, the term "employee" includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". Sec. 3121(d)(2); accord sec. 3306(i).

The regulations provide that

> Generally, such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by

the work and not as to the means and methods for accomplishing the result, he is an independent contractor.  * * * [Secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), Employment Tax Regs.]

The regulations provide a "summary of the principles of the common law, intended as an initial guide" for the employer-employee determination, rather than a workable test complete in itself for determining whether an employer-employee relationship exists.  United States v. W.M. Webb, Inc., 397 U.S. 179, 194 (1970); see also Breaux & Daigle, Inc. v. United States, 900 F.2d 49, 51 (5th Cir. 1990); In re McAtee, 126 Bankr. 568, 571 (N.D. Iowa 1991).

In Avis Rent A Car System, Inc. v. United States, 503 F.2d 423, 429 (2d Cir. 1974), the Court of Appeals for the Second Circuit distilled the following seven factors for determining whether an employer-employee relationship exists (the Avis test) from the Supreme Court's decisions in Bartels v. Birmingham, 332 U.S. 126 (1947), and United States v. Silk, 331 U.S. 704 (1947): (1) If the person receiving the benefit of a service has the right to control the manner in which the service is performed, the person rendering the service may be an employee.  (2) If a person rendering a service has a substantial investment in his own tools or equipment, he may be an independent contractor.  (3) If a person performing a service undertakes a substantial cost, for example, by employing and paying his own laborers, he may be an independent contractor.  (4) If a person performing a service

has an opportunity to profit depending on his management skill, he may be an independent contractor. (5) If a service rendered requires a special skill, the person rendering it may be an independent contractor. (6) If the relationship between a person rendering a service and the person receiving it is permanent, it may be an employment relationship. (7) If a person rendering a service works in the course of the recipient's business, rather than in some ancillary capacity, he may be an employee.

The Court of Appeals for the Eighth Circuit, the court to which any appeal in this case would lie, has adopted the Avis test. See Nuttelman v. Vossberg, 753 F.2d 712, 714 (8th Cir. 1985); In re McAtee, supra at 572. The list of factors in the Avis test is not exhaustive or exclusive. See Breaux & Daigle, Inc. v. United States, supra at 51; Avis Rent A Car System, Inc. v. United States, supra at 429 n.3; In re McAtee, supra at 571-572. Determination of whether individuals are "employees" for the purpose of employment taxes depends upon the totality of their circumstances, and no single consideration governs. See Avis Rent A Car System, Inc. v. United States, supra at 430; Azad v. United States, 388 F.2d 74, 76 (8th Cir. 1968).

Although the determination of employee status is to be made by common law concepts, a realistic interpretation of the term "employee" should be adopted, and doubtful questions should be resolved in favor of employment in order to accomplish the

remedial purposes of the legislation involved.  Breaux & Daigle, Inc. v. United States, supra at 52; see also United States v. Silk, supra at 712 ("As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose.").

Applying these criteria to the facts and circumstances of the present case, we conclude that during the year at issue petitioner's drivers were employees.

1.  Petitioner's Right To Control

"The absence of need to control should not be confused with the absence of right to control."  McGuire v. United States, 349 F.2d 644, 646 (9th Cir. 1965).  The degree of control necessary to find employee status varies with the nature of the services provided by the worker.  See United States v. W.M. Webb, Inc., supra at 192-193; Breaux & Daigle, Inc. v. United States, supra at 52; Azad v. United States, supra at 77; McGuire v. United States, supra at 646 ("The right to control contemplated by the Regulations relevant here and the common law as an incident of employment requires only such supervision as the nature of the work requires.").  It is not necessary that the purported employer "'stand over the employee and direct every move that he makes.'"  Simpson v. Commissioner, 64 T.C. 974, 985 (1975) (quoting Atlantic Coast Life Ins. Co. v. United States, 76 F.

Supp. 627, 630 (E.D.S.C. 1948)).

In this case, the drivers were required to deliver the loads to a certain place at a certain time, and the drivers chose the routes and the speeds that would take them to that destination point by that time. Petitioner was not in the cabs of the trucks supervising every movement of the drivers, directing which routes to take or controlling the speeds at which to drive. Nor did he control which hours the drivers drove or rested. Petitioner did not direct the intimate details of the drivers' work, because the drivers' work requires little supervision. Though petitioner was not required to supervise closely the drivers hour by hour, the right to control was not lacking. See Air Terminal Cab, Inc. v. United States, 478 F.2d at 580.

Petitioner exercised control by requiring the drivers to call him daily on the cellular phones, which he provided, to inform him of their locations and progress. Petitioner controlled which loads the drivers would haul and the prices charged for the transportation of those loads. Petitioner determined whether repairs to the trucks should be performed on the road or deferred until the driver returned the truck to petitioner's business location. On this record, petitioner exercised the necessary control over the drivers' activities consistent with an employer-employee relationship. See Avis Rent A Car Systems, Inc. v. United States, 503 F.2d at 430; Air

Terminal Cab, Inc. v. United States, supra at 580-581; Frische v. Commissioner, T.C. Memo. 2000-237; In re McAtee, 126 Bankr. at 572 (while truck drivers had some discretion as to route chosen to get to particular destination, drivers were obligated to follow directions of employer as to where and when to transport various loads).

2. Substantial Investment

The fact that a worker provides his or her own tools generally indicates independent contractor status. See United Sates v. Silk, 331 U.S. at 716-717; Breaux & Daigle, Inc. v. United States, supra at 53. The drivers had a small investment in their mechanic's tools, which were incidental to their service of driving the truck, and their commercial driver's licenses. Although the drivers incurred some cost in their hand tools and in obtaining and maintaining their commercial driver's licenses, the amount of each driver's investment is insignificant in comparison to petitioner's substantial investment to acquire and maintain his five or six trucks. See In re McAtee, supra at 572; see also United Sates v. Silk, supra (value of the workers' tools was so minimal that this factor was not of great weight); Breaux & Daigle, Inc. v. United States, supra (same).

Most importantly, the drivers had no investment in the trucking equipment; i.e., the tractors and the semitrailers. See Avis Rent A Car System, Inc. v. United States, supra at 430; cf.

Carrell v. Sunland Constr., Inc., 998 F.2d 330 (5th Cir. 1993) (welders were found to be independent contractors partly because welders invested average of $15,000 each in welding equipment). Furthermore, the drivers undertook none of the costs of operating the trucks or transporting the freight; petitioner paid for all repair expenses and maintenance costs on the trucks, and all operating expenses, including insurance, fuel, oil, repairs, tolls, and scale charges. Cf. Labor Relations Div. of Constr. Indus. v. Teamsters Local 379, 156 F.3d 13, 20 (1st Cir. 1998) (independent contractor owner-operators of trucks bear cost of owning and insuring their own trucks and cover fuel, repair, and tax expenses stemming from operation of those vehicles).

The relatively minor investment by the drivers and the substantial investment by petitioner support a finding that the drivers were petitioner's employees.

3. Substantial Costs Incurred by Drivers

The drivers in this case did not incur any substantial costs. The drivers paid their own living expenses while on the road. However, expenditures on personal items are not costs relevant to this factor. Occasionally, the driver hired a lumper to unload a semitrailer; however, the lumper's fee was paid by petitioner, not the driver. (Petitioner's argument regarding the lumpers is considered thoroughly in the discussion of the next factor.) This factor does not support a finding that the drivers

were independent contractors.

4.  Ability To Profit by Management Skills

In considering whether the drivers had an opportunity to profit, we also consider whether they were at risk of loss.  See United States v. Silk, supra at 716, 717.

The drivers had a limited ability to profit by their own management skills.  Drivers were paid by the mile; therefore, to maximize his earnings, a driver had to rely on his own knowledge of traffic patterns and road conditions, his ability to read a map, and his ability to anticipate the need for an alternate route.

However, the ability to read a map and choose a quicker route does not constitute a management skill.  The execution of this duty is only evidence of efficient and hard-working employees.  See In re McAtee, supra at 572.  "[I]nitiative, not efficiency, determines independence".  Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1053 (5th Cir. 1987).  The drivers' energy, care, and judgment may have conserved the equipment and increased their earnings, but petitioner was the director of their activities.

In this case, the drivers were dependent primarily upon petitioner's ability to locate loads for them to haul with his trucks.  If petitioner failed to locate a return load, the drivers would attempt to arrange one through a broker or the load

board at a truck stop; however, the terms and the acceptance of the contract were petitioner's domain. The drivers were unable to exert initiative in any of the major components open to initiative; i.e., advertising, pricing, and choice of clients. See Brock v. Mr. W Fireworks, Inc., supra; Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1313 (5th Cir. 1976). The drivers were not allowed the initiative and did not have the independence or the decision-making authority normally associated with an independent contractor.

Finally, petitioner argues that the drivers had an opportunity to profit through the use of their management skills in unloading the trucks. Petitioner's argument is that the driver could choose to hire a lumper to unload the truck, or the driver could profit by unloading the truck himself. We disagree.

Unloading a truck to earn a lumper's fee is not profiting by management skill. See United States v. Silk, supra at 717-718. Furthermore, if a driver hired a lumper instead of unloading the truck himself, he did not incur a loss through mismanagement. The lumper's fee was provided by petitioner, not by the driver; therefore, a driver who hired a lumper incurred an opportunity cost, not an out-of-pocket expense.

Because the drivers were paid by the mile, they had no real risk of loss. One driver, appearing as respondent's witness, testified that when he chose an alternate route which required

payment of higher tolls, petitioner charged him for the extra expense. We do not find this instance of a driver's liability for the extra toll charges supportive of petitioner's assertion that his drivers were independent contractors.

Charging an employee for losses caused by the employee is not incompatible with employee status. See <u>Gierek v. Commissioner</u>, T.C. Memo. 1993-642 (employee stockbroker charged for substantial trading loss errors); <u>Butchko v. Commissioner</u>, T.C. Memo. 1978-209 (racetrack teller's cash register shortages characterized as employee business expenses and deductible only as itemized deductions), affd. 638 F.2d 1214 (9th Cir. 1981). This factor supports respondent's determination that the drivers were employees.

### 5. <u>Special Skill</u>

Although the Court recognizes that driving a truck requires skill, we do not think that it is the type of skill envisioned by the Court of Appeals for the Second Circuit in deciding <u>Avis Rent A Car System, Inc. v. United States</u>, 503 F.2d 423 (2d Cir. 1974). See <u>In re McAtee</u>, 126 Bankr. at 572. Rather, the special skill pertains to services that are outside of the ordinary course of petitioner's business. See <u>id.</u>; <u>McLaughlin v. Seafood, Inc.</u>, 861 F.2d 450 (5th Cir. 1988) (the workers were not specialists called in to solve a problem, but laborers who performed the essential, everyday chores of their employer's operation). In this case,

the services provided by the drivers were an essential and normal part of petitioner's regular business.  See In re McAtee, supra at 572.  This factor supports a finding that the drivers were petitioner's employees.

6.  Permanency of the Relationship

Generally, the drivers worked for petitioner for a short time.  A transitory work relationship may point toward independent contractor status.  See Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 305 (5th Cir. 1998).  However, if the workers work in the course of the employer's trade or business, that they do not work regularly is not significant.  See United States v. Silk, 331 U.S. at 718; see also Avis Rent A Car System v. United States, supra at 430 (transients may be employees); Kelly v. Commissioner, T.C. Memo. 1999-140 (working for a number of employers during a tax year does not necessitate treatment as an independent contractor).

In considering the permanency of the relationship, we must also consider petitioner's right to discharge the drivers, and the drivers' right to quit, at any time.  Usually, the right to discharge a worker, and the worker's right to quit, at any time indicates an employer-employee relationship.  See United States v. W.M. Webb, Inc., 397 U.S. at 193 ("'The right to discharge is also an important factor indicating that the person possessing that right is an employer.'" (quoting sec. 31.3121(d)-1(c)(2),

Employment Tax Regs.)); <u>Breaux & Daigle, Inc. v. United States</u>, 900 F.2d at 53 (same); <u>Air Terminal Cab, Inc. v. United States</u>, 478 F.2d at 581.

Although most of the drivers worked for only a few months, we find the facts that the drivers' brief periods of employment were in the course of petitioner's regular business and that petitioner had the right to discharge the drivers, and the drivers had the right to quit, most persuasive.  See <u>United States v. Silk</u>, <u>supra</u>.  Accordingly, this factor supports a finding that the drivers were employees of petitioner.

   7.  <u>Service Integral to the Business</u>

The drivers in this case did not have their own independent businesses; rather, they performed a function that was an essential part of petitioner's company's normal operations.  The success of petitioner's trucking business depended, in part, upon the work performed by the drivers.  Therefore, the drivers' services were an integral part of petitioner's business.  See <u>Breaux & Daigle, Inc. v. United States</u>, <u>supra</u> (financial success of processor of crab meat was dependent upon crab meat pickers; therefore, crab meat pickers' services were integral part of processor's business); <u>Air Terminal Cab, Inc. v. United States</u>, <u>supra</u> at 581 (taxicab drivers were performing personal services constituting integral part of taxpayer's business operations); <u>In re McAtee</u>, 126 Bankr. at 572 (truck drivers services were

integral part of taxpayer's trucking business).  This factor supports respondent's determination.

Other Factors

Other factors courts have considered in determining the status of workers are the relationship the parties believed they were creating, see Simpson v. Commissioner, 64 T.C. at 984-985, and whether the taxpayer withheld taxes, worker's compensation, and unemployment insurance funds, see Professional & Executive Leasing, Inc. v. Commissioner, 862 F.2d 751, 753 (9th Cir. 1988), affg. 89 T.C. 225 (1987).

Petitioner treated all of the drivers as independent contractors; he issued the drivers Forms 1099 instead of Forms W-2, and he did not withhold or make contributions of employment taxes.  Most of the drivers, on the other hand, believed they were employees, and reported their earnings from driving petitioner's trucks as wages.  None of the drivers who appeared as a witness testified that he reported his earnings on Schedule C, Profit or Loss From Business (Sole Proprietorship).

Thus, it is clear that petitioner and the drivers were not in agreement about the relationship that they were creating. This factor does not support a finding that the drivers were independent contractors.

Moreover, as we must decide this issue to resolve petitioner's obligation to comply with the employment tax

provisions, consideration of the fact that petitioner did not comply with those provisions, e.g., withhold taxes, worker's compensation, and unemployment insurance funds, would provide no value to our determination. Cf. id. (issue for determination was whether corporation's pension and profit-sharing plans qualified under section 401, I.R.C. 1954).

On the basis of the facts and circumstances of this case, we hold that the drivers were employees of petitioner.

Issue 2. Whether Petitioner Is Eligible for Section 530 Relief

In the notice of determination concerning worker classification, respondent determined that petitioner is "not entitled to relief from this classification pursuant to section 530 of the Revenue Act of 1978". Petitioner assigned error in his petition to this determination and asserts that he is entitled to such relief.

Congress enacted section 530 to alleviate what it perceived as the "overly zealous pursuit and assessment of taxes and penalties against employers who had, in good faith, misclassified employees as independent contractors." Boles Trucking, Inc. v. United States, 77 F.3d at 239 (citing In re Rasbury, 130 Bankr. 990 (N.D. Ala. 1991)). Section 530(a)(1) shields a taxpayer who has mistakenly not classified his workers as employees from employment tax liability if the taxpayer had a reasonable basis for not treating the workers as employees and has filed all

required Federal employment tax returns on a basis consistent with this treatment.  Petitioner never treated the drivers as employees and consistently issued them Forms 1099.  Therefore, the threshold requirement petitioner must satisfy to qualify for section 530 relief is that he had a reasonable basis for treating the drivers as nonemployees.

Section 530(a)(2) provides that reasonable reliance on any of three "safe harbors" shall be treated as a reasonable basis for not treating a worker as an employee.  See Boles Trucking, Inc. v. United States, supra.  Paragraph (2) provides:

> For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following:
>
> (A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;
>
> (B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or
>
> (C) long-standing recognized practice of a significant segment of the industry in which the individual was engaged.

Petitioner provided no evidence that he had a reasonable reliance on any of these safe harbor provisions.  Respondent called as witnesses five of petitioner's former drivers, all of whom were employed as truck drivers at other times for other

trucking companies.  Although, petitioner never questioned the witnesses about their worker status at those other companies, petitioner testified that when he was a driver for other companies, he was treated as an independent contractor.

Petitioner's experience by itself is not evidence of the "long-standing recognized practice of a significant segment" of the trucking industry.  See, e.g., Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1122, 110 Stat. 1755, 1766 (amending section 530 by adding new subsection (e), which provides that "in no event shall the significant segment requirement * * * be construed to require a reasonable showing of the practice of more than 25 percent of the industry (determined by not taking into account the taxpayer)").

The three statutory safe harbor methods are not the exclusive ways that a taxpayer may qualify for section 530 relief.  A taxpayer may qualify by demonstrating that it had some other reasonable basis for treating its workers as independent contractors.  See H. Rept. 95-1748, at 5 (1978), 1978-3 C.B. (Vol. 1) 629, 633 ("A taxpayer who can demonstrate a reasonable basis for the treatment of an individual in some other manner also is entitled to termination of employment tax liabilities."); see also Boles Trucking, Inc. v. United States, supra at 239.

As evidence of a reasonable basis for treating the drivers as independent contractors, petitioner proffered a letter dated

March 31, 2000, sent to him from the Minnesota Department of Economic Security (MDES). The letter states:

> Based on the information we have in our files at this time we will not be making any further effort to hold you individually liable for the unemployment tax debts of the above business [Dayline Trucking]. If new information is made available that changes the situation you will be notified before any further action is taken.

This letter does not support petitioner's assertion that he is entitled to section 530 relief. Petitioner could not have relied on this letter for his treatment of the drivers as it is dated 5 years after the year at issue in the instant case. Furthermore, the letter provides no indication of what information in the MDES files prompted the department to discontinue its efforts to hold petitioner liable for the unemployment debts of his company. Petitioner has not proved that he had a reasonable basis for treating his drivers as independent contractors. Accordingly, we hold that petitioner is not entitled to section 530 relief.

To reflect the foregoing,

<u>Decision will be entered sustaining respondent's notice of determination</u>.